# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 22-10032 |
| | ) | |
| JUSTIN RANDOLPH and STEPHANIE SYLVERNE, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| PRAVATI SPV II, LLC, | ) | Adv. Case No. 22-00190 |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN RANDOLPH d/b/a Law Office of Justin G. Randolph, | ) | Honorable Judge Deborah L. Thorne |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FIRST AMENDED ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

For its First Amended Adversary Complaint against Justin Randolph ("Randolph" or "Debtor"), Plaintiff Pravati SPV II, LLC ("Pravati" or "Plaintiff") respectfully alleges as follows:[1]

---

[1] Pravati reserves the right to amend this First Amended Adversary Complaint to include additional causes of action, including without limitation, nondischargeability for willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6), in the event that the Debtor's bankruptcy case is converted to Chapter 7 or 11.

## I.

## THE PARTIES

1.      Pravati is a duly formed Delaware limited liability company with its seat of business in Maricopa County, Arizona.

2.      At all times relevant hereto, Pravati was a leading provider of commercial funding solutions to lawyers and law firms.

3.      At all times relevant hereto, Randolph was an attorney licensed to practice law and residing in the State of Illinois.

## II.

## JURISDICTION AND VENUE

4.      Pravati realleges and incorporates herein by reference each and every allegation contained in this Adversary Complaint.

5.      On September 1, 2022 (the "Petition Date"), Randolph and his spouse and co-debtor Stephanie Sylverne filed with this Court a Petition for chapter 13 relief, the United States Bankruptcy Court for the Northern District of Illinois, Case No. 22-10032 (the "Bankruptcy Case").

6.      This adversary proceeding arises in and relates to the Bankruptcy Case.

7.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b), and the Court can and should enter final judgment.

AFDOCS:26883709.3

## III.

## FACTUAL BACKGROUND

10.     Pravati realleges and incorporates herein by reference each and every allegation contained in this Adversary Complaint.

11.     Debtor is a litigious attorney who, from 2004 to 2019, operated a law firm, Law Office of Justin G. Randolph, as a sole proprietorship.

12.     Justin S. Holloway ("Holloway") practiced law along with Debtor at the Law Office of Justin G. Randolph.

**A.     The Funding Agreement.**

13.     In 2017, Randolph applied for and received net funding from Pravati of $183,960, pursuant to their Law Firm Legal Funding Contract & Security Agreement dated December 21, 2017 (the "Agreement").

14.     In the initial funding application to Pravati, Randolph was asked "Does the firm owe any taxes?" and checked the box stating "No."

15.     In the initial funding application to Pravati, Randolph was asked "Do you [personally] owe taxes or have any pending claims or judgments against you?" and checked the box stating "No."

16.     In exchange for the capital infusion, the Agreement gave Pravati a lien against and right to payment from Randolph's accounts receivables and payment intangibles ("Proceeds").

17.     The Agreement also provides at Section 5 that "Law Firm also understands, acknowledges and agrees that Law Firm shall not assign, dispose of, encumber, or pledge as security or otherwise all or any portion of the Proceeds or Collateral, or any other interest in any

- 3 -

Case in the Portfolio of Cases or other Related Proceedings unless and until Pravati is first unconditionally and finally paid in full[.]"

18.     In addition, Section 5 of the Agreement provides that "In the event Law Firm is engaged to represent or otherwise acquires any additional future Cases or Related Proceedings, Law Firm shall revise Schedule B to set forth each such newly acquired Cases or Related Proceedings and shall notify Pravati of the revisions to Schedule B in a timely manner." (Emphasis removed).

19.     As later found by the Arbitrator, however, when Randolph executed the Agreement, he knew he had "Cases" which were not included but he failed to inform Pravati of his omissions within 30 days.

20.     In Section 5 of the Agreement, Debtor agreed, *inter alia*, as follows: "Law Firm [Debtor's sole proprietorship] hereby also grants to Pravati a security interest (which shall have a first lien priority) in all Collateral (including all Accounts and Payment Intangibles), whether now or hereafter existing . . . ."

21.     As found by the Arbitrator and as provided in Section 6 of the Agreement: (1) Pravati would be entitled to payment of 50% of the Proceeds from Randolph's cases until all amounts owing were paid in full; and (2) upon a default by Randolph, Pravati would be entitled to payment of 100% of the Proceeds from Randolph's cases.

22.     In Section 6 of the Agreement, Debtor agreed, *inter alia*, as follows: "Law Firm [Debtor's sole proprietorship] agrees, covenants and warrants that all payments (including the payment of all Proceeds) made by or on behalf of any Defendant . . . will be delivered directly to Law Firm and will be immediately deposited by Law Firm . . . into Law Firm's client trust account."

- 4 -

23.     Section 17 of the Agreement provides that:

a.      "Law Firm stipulates that no amounts required to be paid to Pravati pursuant to this Agreement are, and shall not be, subordinated to any other liens or claims of any other party."  Agreement at § 17(d).

b.      "All current liens, assignments, encumbrances or security interest of any kind or nature in or relating to the Proceeds, Collateral, or any other similar rights or assets relating to the Portfolio of Cases or other Related Proceedings are listed on Schedule B." (Emphasis removed).  Agreement at § 17(e).

c.      "Law Firm has paid all of its federal, state, and local taxes through the date of execution of this Agreement or has made provisions for the payment." Agreement at § 17(g).

d.      "All financial disclosures made to Pravati are true, accurate, complete and fairly characterize the financial position of Law Firm."  Agreement at § 17(i).

24.     In Schedule D of the Agreement, Randolph was asked to identify all existing encumbrances and liens against him.  Under penalty of perjury, Debtor avowed that he had "None."

25.     However, despite these numerous representations, at the time Debtor entered into the Agreement, Debtor owed taxes and other debts to governmental entities, including income taxes and unemployment insurance tax to the State of Illinois.

26.     In addition, at the time he entered the Agreement, Debtor had governmental and tax liens against him, including two income tax liens and two unemployment insurance tax liens placed against him by the State of Illinois.

B.    **Randolph's Actions Following Execution of the Agreement.**

27.    Following execution of the Agreement, as later found by the Arbitrator, Debtor settled cases and collected revenues subject to Pravati's first-position lien, but then misappropriated and kept all of the revenues for their own use.

28.    For example, the *Bredemeier* case is included in Schedule B to the Agreement, entitled Law Firm List of Cases and Related Proceedings.   Therefore, it was clearly part of Pravati's collateral.

29.    The *Bredemeier* Case settled for $300,000 on about November 30, 2018.

30.    Debtor's IOLTA summary shows that Debtor received a deposit of $300,000 into their IOLTA account on March 4, 2019.  Of this sum, the Arbitrator found that Debtor paid $200,000 "to someone named Sheirys Bredemeier" and transferred $100,000 to Debtor's operating account.  "None of that money was paid to Claimant."

31.    As found by the Arbitrator, on March 4, 2019, Debtor received the amount of $300,000 into his attorney trust account payment on the client matter of *Bredemeier*.  Of that amount, $100,000 was payable directly to Debtor.

32.    Because, as found by the Arbitrator, Debtor had already defaulted when he received the funds on March 4, 2019, Pravati was entitled to the full $100,000 from the *Bredemeier* case. Pravati was entitled to possession of this collateral pursuant to both the Agreement and applicable law. Nonetheless, Debtor fraudulently appropriated the funds in a manner inconsistent with Pravati's rights. Namely, Debtor converted these monies by transferring the funds to his own checking account via two transactions effectuated on March 6, 2019 ($45,000 and $55,000). To this day, Debtor has not remitted those funds to Pravati. The funds have been wrongfully seized by Debtor.

33.     On June 1, 2018, Debtor admitted to having settled a case for $7,000. Debtor identified the specific case and admitted that "you guys get $3500.00 of that." Because Debtor was in default as of January 20, 2018, as found by the Arbitrator, Pravati was entitled to the full $7,000. One-and-a-half months later, Debtor admitting to owing Pravati "$6250.00 from CAB v. 90 Miles as well." Here again, this is specific case collateral that is identified and, ultimately, converted, as found by the Arbitrator.

34.     The $6,250 is presumably 50% of the net received, such that Debtor converted, embezzled, and defalcated $12,500 from *CAB v. 90 Miles* while acting as a lawyer.

35.     On November 14, 2018, Randolph, acting through Law Office of Justin G. Randolph, filed a fee application seeking attorneys' fees of $269,950.50. Attached to the fee application were $269,959.50 in supporting invoices issued by Law Office of Justin G. Randolph. These supporting invoices included many billing entries by Randolph and Philip Holloway.

36.     Ultimately, the Court on June 1, 2021 entered judgment in favor of Lester and against the United States, including attorneys' fees of $280,339.

37.     The United States has paid the *Lester* judgment, including attorneys' fees and costs, and Debtor has been compensated for his work in the *Lester* case.

38.     Nevertheless, Debtor has not made any payments to Pravati or revised Schedule B of the Agreement.

39.     Similarly, Debtor resolved many other cases that were part of Pravati's continuing lien. The case of *Scott v. Shulkin* generated revenues of at least $60,000. The *Ferguson*, *Butler*, and *Potter* cases were settled for $104,650, $150,150, and $200,200, respectively. The *Frey* case was resolved for $45,000. Debtor resolved many, many other matters, although details of the settlements are not publicly available.

40.    From all these successful resolutions, Debtor has not remitted one payment to Pravati, and despite admitting on various occasions that Debtor did in fact owe money to Pravati, Debtor failed to revise Schedule B of the Agreement, Debtor has not made a single payment to Pravati.

41.    To this day, Debtor has wrongfully retained funds advanced by Pravati *and* has dispossessed Pravati of the Proceeds against which the advance was taken—at least hundreds of thousands, and perhaps millions, of dollars.

42.    Debtor has asserted that the Illinois Rules of Professional Conduct prohibited him from complying with the Agreement, including but not limited to the provisions related to Pravati's security interest, Pravati's right to, and process for delivering to Pravati, Debtor's proceeds.

43.    Upon a default under the Agreement, Debtor's obligations would become full recourse as against all of Debtor's other assets, and Pravati's security interest would attach to all of Debtor's assets.

44.    Moreover, on several occasions between June and August 2018, Debtor represented to Pravati that he had received funds that he was required to remit to Pravati and that he would be sending a wire to Pravati.  Debtor made this representation in order to procure an extension of time before being defaulted by Pravati, after admitting that he settled cases against which Pravati should be paid and after withholding his bank statements from Pravati which would have revealed that he received funds.

45.    On April 2, 2019, Pravati gave written notice to Debtor of occurrences of breach and inaccurate representations.

46.    On the same day, April 2, 2019, Debtor formed Randolph & Holloway LLC ("Randolph & Holloway").

AFDOCS:26883709.3

47.    After forming Randolph & Holloway on April 2, 2019, Debtor appeared in Debtor's cases on behalf of Randolph & Holloway.

48.    Randolph & Holloway is operated by the same two attorneys formerly operating Law Office of Justin G. Randolph—namely, Randolph and Holloway.

**C.    Pravati's Arbitration Award.**

49.    Pursuant to the dispute resolution clause in the Agreement, Pravati on May 8, 2019 commenced arbitration against Debtor before the American Arbitration Association ("AAA") in Case No. 01-19-0001-4311 (the "Arbitration").

50.    Following the first evidentiary hearing in the Arbitration, the Arbitrator on October 22, 2019 issued a reasoned *Final Award of Arbitrator* ("Award") finding Debtor liable to Pravati for, *inter alia*, compensatory damages for breach of contract, fraud, and conversion, in the amount of $183,960, plus interest.

51.    Debtor challenged the Award in the Arizona Superior Court in and for Maricopa County ("Arizona Superior Court") in Case No. CV2019-014865 (the "Confirmation Case"). Ultimately, on October 8, 2020, the Arizona Superior Court ordered Pravati's fraud and conversion claims to be reheard in the Arbitration.

**D.    Randolph's Scorched Earth Litigation.**

52.    Subsequently, between the remand and the second evidentiary hearing on May 5, 2021, Debtor subjected Pravati to a barrage of ancillary litigation and arbitration. For instance, Debtor on March 23, 2021 filed what was his second Motion to Dismiss in the Arbitration, which he misleadingly characterized as a "Motion to Terminate." Debtor therein made a host of arguments irrelevant to Pravati's fraud and conversion claims, including that it was criminal conduct for Pravati to send money to Debtor in the first place, and that Pravati was not licensed as

a "finance lender or broker" in the State of California, which state has no connection to Debtor's funding.

53.     On April 22 and 23, 2021—just days before the May 5, 2021 second evidentiary hearing in the Arbitration—Debtor filed two nearly identical frivolous lawsuits against Pravati, its fund manager (Pravati Capital, LLC), certain individual Pravati employees, a Pravati investor, and others.  The suits made baseless allegations such as participation in organized crime and/or a civil fraud conspiracy ring.

54.     Around this time, Debtor undertook to represent a different bad-actor adversary in litigation against Pravati.

55.     Notwithstanding all the collateral litigation created by Debtor, the second evidentiary hearing would ultimately occur in the Arbitration and result in AAA's issuance on June 7, 2021 of the Second Amended Final Award.

56.     The Second Amended Final Award finds, *inter alia*: (1) Pravati had a valid and perfected security interest in Debtor's accounts receivables and general intangibles; (2) Pravati had demonstrated that Debtor converted at least $119,500 in collateral subject to Pravati's lien.

**E.     Perfection of Pravati's Security Interest.**

57.     On January 3, 2018, Pravati filed a UCC-1 financing statement with the Illinois Secretary of State against "all accounts, account receivable, and general intangibles . . . and all fees, distributions, payments, proceeds, . . . and other benefits which Debtor now is or may hereafter become entitled to receive."  This UCC-1 also referenced certain cases by name, including but not limited to the *Bredemeier* case.

58.      On August 30, 2019, Pravati recorded a UCC-1 financing statement against "[a]ll assets now owned, or hereafter acquired" by Randolph.

AFDOCS:26883709.3

59.    On October 28, 2021, Pravati filed a UCC-3 amendment to make clear that Pravati's lien applies to both Sylverne and Randolph, pursuant to the *Second Amended Final Award of Arbitrator* dated June 7, 2021 ("Second Amended Final Award").

**F.    Pravati Holds Multiple Judgments against Debtor.**

60.    The Arizona Superior Court confirmed the Second Amended Final Award on December 13, 2021.

61.    On May 2, 2022, the Arizona Superior Court entered judgment in favor of Pravati on the Second Amended Final Award for $350,424.80 plus continuing interest (the "Conversion Judgment").

62.    In one frivolous lawsuit that Randolph had commenced against Pravati, its fund manager, certain individual employees, investors, and others before the United States District Court, District of Arizona in Case No. CV-21-00713, Pravati as the successful party obtained a judgment for payment of its legal fees incurred in the amount of $32,128.00 and costs of $96.00 (the "District Court Judgment").

63.    In the second frivolous lawsuit that Randolph had commenced against Pravati, its fund manager, certain individual employees, investors, and others before the Arizona Superior Court in and for Maricopa County in Case No. CV2021-006612, Pravati as the successful party obtained a judgment for payment of its legal fees incurred in the amount of $19,723.01 and costs of $378.08 (the "Superior Court Judgment").

**G.    Pravati Also Has Perfected Judgment Liens.**

64.    The District Court Judgment was registered in the State of Illinois on June 7, 2022.

65.    On July 7, 2022, Pravati recorded its registered District Court Judgment with the Cook County Clerk's Office, Illinois.

AFDOCS:26883709.3

66.     Pravati registered its Conversion Judgment in the State of Illinois on August 12, 2022.

67.     On August 18, 2022, Pravati recorded its registered Conversion Judgment with the Cook County Clerk's Office, Illinois.

## IV.

## FIRST CLAIM FOR RELIEF

## (Exception from Discharge for Fraud Under 11 U.S.C. §§ 523(a)(2)(A), 1328(a)(2))

68.     Pravati realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

69.     Under Section 523(a)(2)(A), debts are not dischargeable if they are "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  There are three separate grounds for a debt to be non-dischargeable: "false pretenses, false representation, and actual fraud." *In re Casali*, 517 B.R. 835, 841 (Bankr. N.D. Ill. 2014).

70.     Debtor knowingly made false representations and material misstatements and omissions to induce Pravati to enter into the Agreement and provide Debtor with tens of thousands of dollars in funding under false pretenses.  Consequently, the debt embodied in the Conversion Judgment is not dischargeable in bankruptcy.

71.     When Debtor entered into the Agreement with and obtained funding from Pravati, he promised to return the capital advance, plus interest and fees, if and when he generated revenues.

- 12 -

72.     As found by the Arbitrator and as provided in Section 6 of the Agreement: (1) Pravati would be entitled to payment of 50% of the Proceeds from Randolph's cases until all amounts owing were paid in full; and (2) upon a default by Randolph, Pravati would be entitled to payment of 100% of the Proceeds from Randolph's cases.

73.     The Agreement provides at Section 5 that "Law Firm also understands, acknowledges and agrees that Law Firm shall not assign, dispose of, encumber, or pledge as security or otherwise all or any portion of the Proceeds or Collateral, or any other interest in any Case in the Portfolio of Cases or other Related Proceedings unless and until Pravati is first unconditionally and finally paid in full[.]"

74.     When Debtor entered into the Agreement with and obtained funding from Pravati, he never intended to satisfy his payment obligations under the Agreement, as shown by his numerous attempts to escape his obligations through transferring Pravati's collateral to Randolph & Holloway, aggressive litigation and other legal tactics, and other bad-faith tactics.

75.     When Debtor entered into the Agreement with and obtained funding from Pravati, Debtor intended to leave Pravati with recourse only against a shell legal entity, rather than Debtor individually, as shown by his creation of the alter ego Randolph & Holloway and transferring Pravati's collateral the alter ego.

76.     Despite having generated and collected hundreds of thousands of dollars in revenues after receiving funding, Debtor has paid nothing to Pravati.

77.     Furthermore, the Agreement provides at Section 5 that "In the event Law Firm is engaged to represent or otherwise acquires any additional future Cases or Related Proceedings, Law Firm shall revise Schedule B to set forth each such newly acquired Cases or Related

- 13 -

Proceedings and shall notify Pravati of the revisions to Schedule B in a timely manner." (Emphasis removed).

78.     Nonetheless, Debtor never intended to pay Pravati from his future cases, as shown by the fact that he knowingly withheld cases from the case list included in the Agreement as Schedule B at the time of executing the Agreement, and never updated Schedule B.

79.     In Schedule A of the Agreement, Debtor represented that "Firm will provide all cases as collateral constituting all fees, distributions, payments, proceeds, preferences and other benefits which Firm now is or may hereafter become entitled to receive."

80.     In Schedule A of the Agreement, Debtor promised to remit to Pravati on a monthly basis 15% of all hourly fees collected.

81.     In Section 5 of the Agreement, Debtor agreed, *inter alia*, as follows: "Law Firm [Debtor's sole proprietorship] hereby also grants to Pravati a security interest (which shall have a first lien priority) in all Collateral (including all Accounts and Payment Intangibles), whether now or hereafter existing . . . ."

82.     In Section 5 of the Agreement, Debtor agreed, *inter alia*, as follows: "Law Firm [Debtor's sole proprietorship] acknowledges and agrees that this Agreement creates a contractual right for Pravati to receive payment of future Proceeds . . . whenever any such Case or Proceeding settles or is reduced to a judgment and, as such, at that time, automatically and immediately becomes a perfected security interest in such Proceeds."

83.     In Section 6 of the Agreement, Debtor agreed, *inter alia*, as follows: "Law Firm [Debtor's sole proprietorship] agrees, covenants and warrants that all payments (including the payment of all Proceeds) made by or on behalf of any Defendant . . . will be delivered directly to

- 14 -

Law Firm and will be immediately deposited by Law Firm . . . into Law Firm's client trust account."

84.     Debtor has asserted that the Illinois Rules of Professional Conduct prohibited him from complying with the Agreement, including but not limited to the provisions referenced above.

85.     Debtor entered into the Agreement with Pravati knowing he would later argue that he was unable to comply with the Agreement because, in his view, his compliance with the provisions of the Agreement was inconsistent with the Illinois Rules of Professional Conduct because he was a practicing attorney charged with knowing the Illinois Rules of Professional Conduct.

86.     That is to say that Debtor defrauded Pravati by representing throughout the Agreement that he was agreeing to things he believed they could not agree to, such as certain conveyances and liens.

87.     As discussed herein, Debtor's disclosures were false, inaccurate, and fraudulent.

88.     Debtor deprived Pravati of the truth, and Pravati would not have funded Debtor if it had known the truth about Debtor.

89.     Debtor's misrepresentations induced Pravati to provide substantial funds to Debtor.

90.     By making these and other misrepresentations to Pravati—including, but not limited to, the Debtor's intent to repay his obligations—Randolph fraudulently induced Pravati to provide tens of thousands of dollars in funding.

91.     Pravati reasonably relied on these misrepresentations by Debtor, a licensed attorney.

- 15 -

92.     Debtor knew that these misrepresentations were materially false and fraudulent when made, and made such misrepresentations to Pravati with the specific intent to induce Pravati to enter into the Agreement and pay tens of thousands of dollars to Debtor.

93.     Debtor acted with reckless disregard for the truth of the misrepresentations.

94.     These misrepresentations did, in fact, deceive Pravati and induced Pravati to fund Debtor, which resulted in the financial losses described herein.

95.     After the Agreement was executed, Debtor continued to misrepresent: (1) his true intent to not honor the Agreement; (2) his true intent to transfer his cases to a different entity; (3) his intent not to revise Schedule B of the Agreement to include future cases; and (4) his intent not to make payments consistent with the Agreement.

96.     For instance, on several occasions between June and August 2018, Debtor represented to Pravati that he had received funds that he was required to remit to Pravati and that he would be sending a wire to Pravati. Debtor made this representation in order to procure an extension of time before being defaulted by Pravati, after admitting that he settled cases against which Pravati should be paid and after withholding his bank statements from Pravati, which would have revealed that he received funds.

97.     Pravati relied upon the misrepresentations of Debtor, and such reliance was actual and justifiable under the circumstances.

98.     But for the misrepresentations, Pravati would not have funded Debtor, and through Debtor's misrepresentations, Debtor caused Pravati to suffer damages.

99.     But for the false statement that Debtor would be making a payment to Pravati, Pravati would have defaulted Debtor and taken legal action sooner.

- 16 -

100.    As a proximate result of Debtor's fraudulent conduct, Pravati has suffered damages, plus interests, costs, and fees, to be determined at trial.

101.    Moreover, in awarding the Conversion Judgment, the Arizona Superior Court already found that Pravati has suffered damages.

102.    Accordingly, the debt owed by Debtor to Pravati is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**V.**

**SECOND CLAIM FOR RELIEF**

**(Exception from Discharge for Fraud Under 11 U.S.C. §§ 523(a)(2)(B), 1328(a)(2))**

103.    Pravati realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

104.    Under Section 523(a)(2)(B), debts are not dischargeable if they are "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by...use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."  11 U.S.C. § 523(a)(2)(B).  "To prevail on a claim under this section, the creditor must prove that the debtor made a materially false written statement about his financial condition with the intent to deceive, and that the creditor reasonably relied on the statement."  *In re Cohen*, 507 F.3d 610, 613 (7th Cir. 2007).

105.    In the initial funding application to Pravati, Randolph was asked "Does the firm owe any taxes?" and checked the box stating "No."

AFDOCS:26883709.3

106.    In the initial funding application to Pravati, Randolph was asked "Do you [personally] owe taxes or have any pending claims or judgments against you?" and checked the box stating "No."

107.    Section 17 of the Agreement provides that:

    a.    "Law Firm stipulates that no amounts required to be paid to Pravati pursuant to this Agreement are, and shall not be, subordinated to any other liens or claims of any other party."  Agreement at § 17(d).

    b.    "All current liens, assignments, encumbrances or security interest of any kind or nature in or relating to the Proceeds, Collateral, or any other similar rights or assets relating to the Portfolio of Cases or other Related Proceedings are listed on Schedule B." (Emphasis removed).  Agreement at § 17I.

    c.    "Law Firm has paid all of its federal, state, and local taxes through the date of execution of this Agreement or has made provisions for the payment." Agreement at § 17(g).

108.    In Schedule D of the Agreement, Randolph was asked to identify all existing encumbrances and liens against him.  Under penalty of perjury, Debtor avowed that he had "None."

109.    The Agreement provides at § 17(i) that "all financial disclosures made to Pravati are true, accurate, complete and fairly characterize the financial position of Law Firm."

110.    Despite numerous representations in the initial funding application and Section 17(e) and (g) and Schedule D of the Agreement, at the time Debtor entered into the Agreement, Debtor owed taxes and other debts to governmental entities, including income taxes and unemployment insurance tax to the State of Illinois.

111.    At the time Debtor entered into the Agreement, Debtor owed taxes and other debts to governmental entities, including income taxes and unemployment insurance tax to the State of Illinois.

112.    In addition, at the time he entered the Agreement, Debtor had governmental and tax liens against him, including two income tax liens and two unemployment insurance tax liens placed against him by the State of Illinois.

113.    Debtor knew or should have known of the tax debts and liens.

114.    In Schedule A of the Agreement, Debtor represented that "Firm will provide all cases as collateral constituting all fees, distributions, payments, proceeds, preferences and other benefits which Firm now is or may hereafter become entitled to receive."

115.    As found by the Arbitrator, however, when Randolph executed the Agreement, he knew he had "Cases" which were not included but he failed to inform Pravati of his omissions within 30 days.

116.    By making these and other misrepresentations to Pravati—including, but not limited to, the representations regarding existing liens and encumbrances, the Debtor's tax compliance, the Debtor's assets, and the Debtor's intent to repay his obligations—Randolph fraudulently induced Pravati to provide tens of thousands of dollars in funding.

117.    The aforementioned representations were made in writing.

118.    The aforementioned representations—including, but not limited to, the representations regarding existing liens and encumbrances, the Debtor's tax compliance, and the Debtor's assets and liabilities—were knowingly and materially false.

119.    Debtor intended to make or publish the aforementioned representations with intent to deceive Pravati and/or with reckless disregard for their truth and whether Pravati would rely

AFDOCS:26883709.3

upon them, as shown by his concealment of his liabilities (including the liens) and assets, such as the undisclosed cases, as well as his subsequent delay tactics, including filing multiple lawsuits against Pravati and creating Randolph & Holloway as an alter ego so that he could transfer Pravati's collateral to that entity.

120.    Pravati relied upon the aforementioned representations of Debtor, and such reliance was actual and justifiable under the circumstances.

121.    But for Debtor's aforementioned representations, Pravati would not have funded Debtor as described herein, and through Debtor's aforementioned misrepresentations, Debtor caused Pravati to suffer damages.

122.    As a proximate result of Debtor's fraudulent conduct, Pravati has suffered damages, plus interests, costs, and fees, to be determined at trial.

123.    Moreover, in awarding the Conversion Judgment, the Arizona Superior Court already found that Pravati has suffered damages.

124.    Accordingly, the debt owed by Randolph and the Firm to Pravati is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

## VI.

## <u>THIRD CLAIM FOR RELIEF</u>

## **(Exception from Discharge for Fraud Under 11 U.S.C. §§ 523(a)(4), 1328(a)(2))**

125.    Pravati realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

126.    Section 523(a)(4) excepts from discharge debts incurred by the debtor for embezzlement, misappropriation, or which were incurred while acting as a fiduciary.

- 20 -

127.    Embezzlement, for purposes of 11 U.S.C. § 523, is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989).

128.    Misappropriation and defalcation occur when a lawyer uses trust funds for an unauthorized purpose, including paying the lawyer's own personal obligations.

129.    At all relevant times, Illinois Rule of Professional Conduct 8.4 prohibited lawyers from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation."

130.    At all relevant times, Illinois Rule of Professional Conduct 1.15(a) imposed on Debtor a duty to "hold property of clients or third persons . . . separate from the lawyer's own property.").

131.    Per the Illinois Attorney Registration & Disciplinary Commission's ("IARDC") Client Trust Account Handbook at Section I(A), "a lawyer who holds the funds or property of a client or third person in trust, even if for a brief time or intermittently, has the duty of a fiduciary to safeguard and segregate those assets."

132.    Per the IARDC Client Trust Account Handbook at Section I(A), "[h]olding property in trust is a non-delegable, personal fiduciary responsibility as long as that property remains in the lawyer's possession."

133.    Per the IARDC Client Trust Account Handbook at Section II, "[a]ll property that is the property of clients or third persons, including prospective clients, held by the lawyer should be held with the care required of a professional fiduciary."

134.    Attorneys are fiduciaries, and as an attorney, Debtor is a fiduciary.

135.    Pravati is the holder of a valid and continuing security interest in Debtor's accounts receivables and payment intangibles.

AFDOCS:26883709.3

136.    Debtor appropriated funds entrusted to him for his own purpose, and he did so willfully, intentionally, and vindictively in order to harm Pravati.

137.    When Debtor entered into the Agreement, he gave Pravati a first-position security interest in his accounts receivables and payment intangibles.  After Debtor's default on January 20, 2018, Pravati would be entitled to first-position payment from all of Debtor's assets, including all receivables and payment intangibles (100%), until satisfied.  Debtor was prohibited from commingling funds subject to Pravati's lien with their own funds.

138.    As found by the Arbitrator in the Second Amended Award, "the Agreement did also establish a specific manner of treating funds subject to the security interest."

139.    Following execution of the Agreement, Debtor settled cases and collected revenues subject to Pravati's first-position lien, but then misappropriated and kept all of the revenues for his own use.

140.    For example, the *Bredemeier* case is included in Schedule B to the Agreement, entitled Law Firm List of Cases and Related Proceedings. (Exhibit 1, pg. 23).  Therefore, it was clearly part of Pravati's collateral.

141.    The *Bredemeier* case settled for $300,000 on about November 30, 2018, and of this sum, Debtor paid $200,000 "to someone named Sheirys Bredemeier" and transferred $100,000 to Debtor's operating account.  "None of that money was paid to Claimant."

142.    Debtor's IOLTA summary shows that Debtor received a deposit of $300,000 into their IOLTA account on March 4, 2019.

143.    As found by the Arbitrator, on March 4, 2019, Debtor received into his attorney trust account payment on the client matter of *Bredemeier* in the amount of $300,000. Of that amount, $100,000 was payable directly to Debtor.

- 22 -

144.    Because, as found by the Arbitrator, Debtor had already defaulted when he received the funds on March 4, 2019, Pravati was entitled to the full $100,000 from the *Bredemeier* Case. Pravati was entitled to possession of this collateral pursuant to both the Agreement and applicable law. Nonetheless, Debtor fraudulently appropriated the funds in a manner inconsistent with Pravati's rights. Namely, Debtor converted these monies by transferring the funds to his own checking account via two transactions effectuated on March 6, 2019 ($45,000 and $55,000). To this day, Debtor has not remitted those funds to Pravati. The funds have been wrongfully seized by Debtor.

145.    On June 1, 2018, Debtor admitted to having settled a case for $7,000. Debtor identified the specific case and admitted that "you guys get $3500.00 of that." Because Debtor was in default as of January 20, 2018, as found by the Arbitrator, Pravati was entitled to the full $7,000. One-and-a-half months later, Debtor admitting to owing Pravati "$6250.00 from CAB v. 90 Miles as well." Here again, this is specific case collateral that is identified and, ultimately, converted, as found by the Arbitrator.

146.    The $6250 is presumably 50% of the net received, such that Debtor converted, embezzled, and defalcated $12,500 from CAB v. 90 Miles while acting as a lawyer.

147.    Among other examples, the *Lester* case is specifically identified as being subject to the Agreement.

148.    On November 14, 2018, Randolph, acting through Law Office of Justin G. Randolph, filed a fee application seeking attorneys' fees of $269,950.50. Attached to the fee application were $269,959.50 in supporting invoices issued by Law Office of Justin G. Randolph. These supporting invoices included many billing entries by Randolph and Philip Holloway.

- 23 -

149.    Ultimately, the Court on June 1, 2021 entered judgment in favor of Lester and against the United States, including attorneys' fees of $280,339.

150.    The United States has paid the *Lester* judgment, including attorneys' fees and costs.

151.    Debtor has been compensated for his work in the *Lester* case.

152.    Debtor has not to this day made any payments to Pravati.

153.    Debtor resolved many other cases that were part of Pravati's continuing lien. The case of *Scott v. Shulkin* generated revenues of at least $60,000. The *Ferguson*, *Butler*, and *Potter* cases were settled for $104,650, $150,150, and $200,200, respectively. The *Frey* case was resolved for $45,000. Debtor resolved many other matters, although details of the settlements are not publicly available.  From all these successful resolutions, Debtor has not remitted one payment to Pravati.

154.    Debtor converted, embezzled, and defalcated the revenues, funds and Proceeds described herein, which were wrongfully seized or utilized for Debtor's own purpose, and he did so willfully, intentionally, and vindictively in order to harm Pravati.

155.    As a proximate result of Debtor's conduct, Pravati has suffered damages, plus interests, costs, and fees, to be determined at trial.

156.    Moreover, in awarding the Conversion Judgment, the Arizona Superior Court already found that Pravati has suffered damages.

157.    Accordingly, the debt owed by Randolph and the Firm to Pravati is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## VII.

### RELIEF REQUESTED

**WHEREFORE**, Pravati prays for judgment as follows:

- 24 -

1.      **On the First and Second Claims for Relief:**

     a.      That Debtor's debts to Pravati be deemed within the purview of 11 U.S.C. §§ 523(a)(2);

     b.      That Debtor's debts to Pravati are excepted from discharge under 11 U.S.C. § 523(c); and

     c.      For pre-judgment interest on any amount recovered at the lawful rate in an amount to be established according to proof at trial;

     d.      For punitive damages; and

     e.      For Pravati's attorneys' fees and costs.

2.      **On the Third Claim for Relief:**

     a.      That Debtor's debts to Pravati be deemed within the purview of 11 U.S.C. §§ 523(a)(4);

     b.      That Debtor's debts to Pravati are excepted from discharge under 11 U.S.C. § 523(c); and

     c.      For pre-judgment interest on any amount recovered at the lawful rate in an amount to be established according to proof at trial;

     d.      For punitive damages; and

     e.      For Pravati's attorneys' fees and costs.

AFDOCS:26883709.3

Dated: February 8, 2023

Respectfully submitted,

**ARENTFOX SCHIFF LLP**

By: */s/  Annie Y. Stoops*
    Aram Ordubegian (*pro hac vice admitted*)
    Annie Y. Stoops (*pro hac vice admitted*)
    ArentFox Schiff LLP
    555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013
    Telephone: (213) 629-7400
    Facsimile: (213) 629-7401
    Email: aram.ordubegian@afslaw.com
    annie.stoops@afslaw.com

    J. Mark Fisher (ARDC No. 3121711)
    ArentFox Schiff LLP
    233 South Wacker Drive, Suite 7100
    Chicago, IL 60606 USA
    Telephone: (312) 258-5500
    Facsimile: (312) 258-5600
    Email: mark.fisher@afslaw.com

    Attorneys for Plaintiff Pravati SPV II, LLC

AFDOCS:26883709.3

## CERTIFICATE OF SERVICE

I, Annie Y. Stoops, certify that I served a copy of this amended complaint on each entity shown on the following list at the address shown and by the method indicated on the list on February 8, 2023.

**Via ECF**:

Aram Ordubegian on behalf of Plaintiff Pravati SPV II, LLC
aram.ordubegian@afslaw.com

Annie Yang Stoops on behalf of Plaintiff Pravati SPV II, LLC
annie.stoops@arentfox.com

Justin R. Storer on behalf of Defendant Justin Randolph
jstorer@wfactorlaw.com, bharlow@wfactorlaw.com

**Via U.S. Mail**

Co-Debtor and Defendant

Justin Randolph
630 Brewster Lane
Schaumburg, IL 60193

Justin Randolph dba Law Office of Justin G.
Randolph
c/o Justin G. Randolph
53 W. Jackson Blvd., Ste 1234
Chicago, IL 60604

Co-Debtor and Former Defendant

Stephanie Sylverne
630 Brewster Lane
Schaumburg, IL 60193

Stephanie Sylverne dba Law Office of Justin
G. Randolph
c/o Justin G. Randolph
53 W. Jackson Blvd., Ste 1234
Chicago , Il 60604

Dated: February 8, 2023

By: */s/ Annie Y. Stoops*
Annie Y. Stoops (*pro hac vice admitted*)
ArentFox Schiff LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: (213) 629-7400
Facsimile: (213) 629-7401
Email: annie.stoops@afslaw.com

AFDOCS:26883709.3